**TAX ANALYSTS AND ADVOCATES and Thomas F. Field, Appellants,**

v.

**Michael BLUMENTHAL, Secretary of Treasury of the United States, et al.**

No. 75–1304.

United States Court of Appeals, District of Columbia Circuit.

Argued 8 Jan. 1976.

Decided 15 June 1977.

As Amended 27 June 1977.

---

Joseph Onek, Washington, D.C., with whom Eldon V. C. Greenberg and Richard A. Frank, Washington, D.C., were on the brief, for appellants.

Leonard J. Henzke, Jr., Atty., Tax Div., Dept. of Justice, Washington, D.C., with whom Scott P. Crampton, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Richard Farber, Atty., Tax Div., Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before BAZELON, Chief Judge, and TAMM and WILKEY,* Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

BAZELON, Chief Judge, dissents and indicates that, for the following reasons, he will file a statement of his views at a later date:

In my view, the issues raised by this case are substantially similar to those raised by another case now pending before this court, *American Society of Travel Agents v. Blumenthal*, No. 75–1782, 184 U.S.App.D.C. ——, 566 F.2d 145, in which I am also participating. I wish to have the opportunity to consider the opinion in that latter case before responding to the majority opinion in this case.

WILKEY, Circuit Judge:

The appellants in this case are Tax Analysts and Advocates (TAA), a non-profit

---

* After oral argument, District Judge Justice, United States District Judge for the Eastern District of Texas, the third member of the panel, who was sitting by designation pursuant to 28 U.S.C. § 292(d), found it necessary to recuse himself. By random selection, Circuit Judge Wilkey was assigned to replace him on the panel and was assigned to write the opinion on 9 February 1977.

corporation organized under the laws of the District of Columbia for the purpose of promoting tax reform, and Thomas F. Field, Executive Director of TAA. Appellants filed suit in the District Court[1] seeking a declaratory judgment that certain published and private rulings of the Internal Revenue Service (IRS) allowing tax credits for payments made to foreign nations in connection with oil extraction and production are contrary to the Internal Revenue Code (Code) and therefore unlawful.[2] In addition, appellants sought an injunction requiring the IRS to withdraw the rulings and to collect taxes from oil companies for all periods not barred by the statute of limitations in those cases where foreign tax credits were taken pursuant to the rulings.[3] Both appellants claim to have standing to sue as federal taxpayers; TAA makes this claim as the representative of its members, who are federal taxpayers,[4] while appellant Field relies on his status as an individual taxpayer.[5] In addition, appellant Field contends that he has standing as a competitor in his capacity as the owner of the entire working interest in a currently producing domestic oil well.[6]

■ On a motion by the defendants,[7] the District Court (Hart, J.) dismissed the complaint[8] on the grounds that appellants lacked standing to bring the action.[9] We agree with the District Judge and conclude that both appellants lack standing as federal taxpayers because they have suffered no judicially cognizable injury in this capacity, and thus affirm the District Court on the rationale stated in its opinion.[10] In addition, we conclude that Appellant Field, while suffering injury in fact as a competitor dealing in oil extraction and production,

---

1. Jurisdiction is alleged under 28 U.S.C. §§ 1340, 2201, 2202, and 5 U.S.C. §§ 702, 703. Amended Complaint, ¶ 2, Joint Appendix (J.A.) at 39. These latter statutory provisions no longer serve as a basis for jurisdiction in the federal courts. See *Califano v. Sanders*, 430 U.S. 99, 106, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

   Prior to the filing of this suit in the District Court, appellants filed a petition with the Commissioner of the Internal Revenue Service seeking to have the Revenue Rulings at issue in this case revoked. According to appellants, no response was made to the petition. Amended Complaint, ¶¶ 23, 24, J.A. at 45.

2. Amended Complaint, J.A. at 45.

3. *Id.* at 45–46.

4. *Id.* ¶ 3, J.A. at 39.

5. *Id.* ¶ 4(a), J.A. at 39.

6. *Id.* ¶ 4(b), J.A. at 39–40. The oil well is located in Venango County, Pennsylvania; the oil produced at this location is not subject to price controls imposed by the federal government. *Id.*

7. The defendants in this case are the Secretary of the Treasury and the Commissioner of the IRS. Both are sued in their official capacities. Amended Complaint, ¶¶ 5, 6, J.A. at 40.

8. Appellants filed their original complaint on 17 June 1974. The complaint was amended on 13 August 1974 to reflect appellant Field's acquisition of the entire working interest in a domestic oil well.

9. 390 F.Supp. 927 (D.D.C.1975).

10. As federal taxpayers, both appellants claim "a personal pecuniary interest in requiring that the IRS assess and collect taxes owed by other taxpayers to the fullest possible extent under the provisions of the Code." Amended Complaint, ¶¶ 3, 4, J.A. at 39. According to the appellants, the published and private IRS rulings at issue in the case cause injury in fact to this interest by decreasing the amount of taxes paid into the Federal Treasury by United States companies operating abroad in the area of oil extraction and production. Appellants aver that the monetary loss to the United States Treasury attributable to the treatment of the foreign income taxes on income from oil production as creditable against United States tax liability, rather than as deductible costs of business, amounted to $3 billion in 1974. Amended Complaint, ¶ 16, J.A. at 42. According to appellants, this decrease in revenue causes their federal income taxes to rise in some unstated amount.

   With respect to these claims of taxpayer standing, we affirm the District Court's finding of no injury in fact and adopt the reasoning of the District Court as put forth at 390 F.Supp. 932–38. Since appellants have not satisfied this basic constitutional requirement of injury in fact, there is no need to explore the other inquiries relevant to prudential limitations on standing. *See* text and notes at notes 29 to 34, *infra*. *See also Harrington v. Bush*, 180 U.S. App.D.C. 45, at 60, 553 F.2d 190 at 205 n.68 (1977).

does not assert an interest that falls within the "zone of interests" protected by the relevant provisions of the Code and therefore does not have standing in this context. Accordingly, we affirm the order of the District Court.

## I. THE NATURE OF APPELLANTS' CHALLENGE

### A. *The Challenged Agency Action*

Section 901(b) of the Code allows qualified citizens of the United States and domestic corporations to claim a tax *credit* for "the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country . . . ." [11] This credit can be taken only for foreign income taxes paid; [12] no credit is allowed for the payment of excise taxes, severance taxes, mineral royalties, or similar payments to foreign governments. Excise taxes, severance taxes, and royalty payments are treated, when appropriate, as ordinary business expenses and therefore result in *deductions* from gross income rather than in tax credits which can offset tax liability on a dollar-for-dollar basis.

Beginning in the 1950's, the principal oil producing nations in the Middle East, North Africa and South America promulgated a series of formal income tax statutes which imposed net income taxes on United States companies producing oil in those nations.[13] In 1955, the IRS published Revenue Ruling 55–296 which allowed a foreign tax credit for income taxes paid to Saudi Arabia.[14] In 1968 the Service promulgated Revenue Ruling 68–552 allowing a foreign tax credit for

income taxes imposed by Libya.[15] In addition, the IRS has issued several private rulings allowing foreign tax credits for income taxes levied by Iran, Kuwait, and Venezuela in connection with oil production in those countries.[16]

Appellants contend that the income taxes paid by United States companies to the foreign nations listed above are not creditable taxes within the meaning of Section 901(b) of the Code. Rather, appellants assert that these taxes are in substance either royalties paid for the right to extract oil from land owned by the foreign nations, or excise, severance, or similar taxes which are not creditable under Section 910(b).[17] Appellant Field, as the owner of a domestic oil well, pays the owner of the land on which his well is located a regular royalty payment for the right to extract oil from the land; [18] under the Code, appellant can deduct these payments from gross income but cannot credit them against his tax liability. In effect, appellants allege that the IRS has exalted form over substance in allowing the tax credits at issue; all of the injuries which appellants put forth to support their standing flow from this decision to treat the foreign income taxes as creditable taxes, rather than as deductible expenses, for their taxpaying competitors.

Having outlined the substantive merits of appellants' claims, it remains to relate this aspect of the case to the issue of standing. Under the relevant Supreme Court directive, we "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the

---

**11.** 26 U.S.C. § 901(b)(1).

**12.** 26 U.S.C. § 903 provides that "the term 'income, war profits, and excess profits taxes' shall include a tax paid in lieu of a tax on income, war profits, or excess profits otherwise generally imposed by any foreign country . . . ." Appellants claim that the payments to foreign nations at issue in this case cannot be considered as "in lieu of" taxes within the meaning of Section 903. We accept this contention as being true for the limited purpose of ruling on the question of standing. *See* note 19, *infra*.

**13.** Amended Complaint, ¶ 9, J.A. at 40.

**14.** 1955–1 Cum.Bull. 386.

**15.** 1968–2 Cum.Bull. 306.

**16.** Amended Complaint, ¶ 10, J.A. at 41; Brief for Appellees at 5.

**17.** Amended Complaint, ¶ 12, J.A. at 41.

**18.** Amended Complaint, ¶¶ 18, 19, J.A. at 42.

complaining party." [19] This standard of review dictates that we assume that the IRS has improperly allowed a tax credit for the payments to foreign nations in connection with oil extraction and production. This assumption as to illegality does not in and of itself confer standing on anyone to challenge the illegality.[20] Rather, as this court has stated, *"the proper inquiry is whether the illegality does injury to an interest of the complaining party."* [21] We now turn to an examination of the interests and injuries put forth by appellant Field to support his standing as a competitor in this case.[22]

### B. Competitor Standing

As an independent domestic oil producer, appellant Field competes in the domestic market with those companies which are granted tax credits for the income taxes paid to foreign nations. As a competitor, appellant Field claims that the Internal Revenue Code grants him a protected interest in competitive fairness and equity in matters of federal taxation which has been injured by the published and private rulings made pursuant to Section 901(b). Appellant believes that this asserted interest confers on him the right to "challenge[ ] as inequitable and illegal the favorable treatment received by others as a result of Internal Revenue Service action." [23]

Appellant alleges two injuries in his capacity as a competitor. As the first injury appellant Field alleges that the IRS rulings "result in his obtaining lower prices for his oil production than he would receive if the international companies could only deduct and not credit their oil production related payments." [24] The rulings at issue in this case enable the international companies to pay far less income tax to the United States than if these payments were merely deductible. A substantial portion of the oil produced in Saudi Arabia, Libya, Kuwait, Iran and Venezuela by United States companies is exported to the United States. The prices charged by the international companies largely determine the market price for uncontrolled crude oil received by independent producers such as appellant Field. According to appellants, the lower taxes paid by the international companies allow these companies to sell their foreign oil in the United States at lower prices than would prevail if the companies could only deduct and not credit their foreign income tax payments.[25] Thus, as a consequence, appellant Field contends that the IRS rulings result in competitive injury due to the loss of potential income in the sale of his domestically produced oil.

The second injury of a competitive nature alleged by appellant Field concerns the impact of the challenged rulings on the value of his operating interest in his domestic oil well. According to appellant Field, the challenged IRS rulings increase the net income from foreign oil production over what it would be if the foreign payments could only be deducted from gross income for federal tax purposes.[26] Thus, as a result of

**19.** *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

**20.** *See United States v. Richardson,* 418 U.S. 166, 179, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Harrington v. Bush, supra,* note 10, 180 U.S. App.D.C. at 52, 553 F.2d at 197 n.31.

**21.** *Harrington v. Bush, supra* note 10, 180 U.S. App.D.C. at 52, 553 F.2d at 197 (emphasis in original).

**22.** The issue of taxpayer standing has been dealt with in text and notes at notes 4 to 10, *supra,* and will not concern us during the remainder of our analysis.

**23.** Brief for Appellants at 18. There are statutory provisions providing for judicial review of IRS action at the request of one whose taxes are in question. *See* 26 U.S.C. § 6213(a). These challenges usually take place within the context of a refund or deficiency suit.

Appellant presents a different type of case in this action by attempting to use alleged competitive injury to himself as the basis for the challenge of the IRS action; he does not put forth the question of his own tax liability or that of the international companies taking advantage of the tax credit allowed by the challenged rulings as the basis for his standing.

**24.** Amended Complaint, ¶ 18, J.A. at 44.

**25.** *Id.* ¶ 19, J.A. at 44.

**26.** *Id.*

the rulings, foreign oil production yields higher investment returns and investors are more willing to invest in foreign oil production than they would be if the rulings had not been promulgated.[27] The value of foreign oil well investments is therefore increased relative to similar domestic investments, to the alleged competitive detriment of appellant Field.

The asserted competitive interest and alleged injuries presented by appellant Field will now be tested against the standards developed by the Supreme Court in the area of standing.[28]

## II. ANALYSIS OF STANDING CLAIMS

### A. *Preliminary Considerations*

■■■ The standing doctrine has two sources: the "case or controversy" requirement of Article III of the Constitution,[29] and judicially imposed rules of self-restraint known as "prudential limitations."[30] In the context of this case, we have occasion to apply both the constitutional and prudential dimensions of the standing doctrine and thus to illuminate the relationship between these two elements of the doctrine.[31] The Article III constitutional requirement is one of "injury in fact, economic or otherwise";[32] such injury is the "irreducible constitutional minimum which must be present in every case."[33] If a court finds that there is no injury in fact, "no other inquiry is relevant to consideration of . . . standing."[34] The vast majority of the case law on standing at all levels of the federal court system has been directed at defining this constitutionally based concept of injury in fact.

■■■ Prudential limitations, on the other hand, are not constitutional requirements; these limitations are developed and imposed by the Supreme Court in its supervisory capacity over the federal judiciary.[35] It is clear that Congress may remove these prudential limitations by statute; Congress has chosen to exercise this authority on various occasions.[36] There has been no Congressional authorization of appellants' action here; therefore, the prudential limitations developed by the Supreme Court are fully applicable in this context.[37] To date, at least three prudential limitations have

27. *Id.*

28. *See Harrington v. Bush, supra* note 10, 180 U.S.App.D.C. at 60, 553 F.2d at 205 n.68.

29. The Supreme Court first clearly stated the constitutional nature of the injury in fact requirement in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) and has been consistent in this interpretation in all subsequent discussions of standing.

30. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

31. We deny the claims as to taxpayer standing because we find no injury in fact; *see* note 10, *supra.* With respect to competitor standing, however, we recognize that injury in fact has occurred but proceed to deny standing based on a prudential limitation; *see* Part II.B.2, *infra.*

32. *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

33. *Harrington v. Bush, supra* note 10, 180 U.S. App.D.C. at 60, 553 F.2d at 205 n.68.

34. *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 227 n.16, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974).

35. *See, e. g., Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

36. For a collection of statutes in which Congress has removed the prudential standing barriers, *see* C. Wright, *et al., Federal Practice and Procedure* ¶ 3531 (p. 71, 1977 Supplement). For the clearest example of the operation of this Congressional control over prudential limitations in the judicial context, *see Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

37. We believe that the fact that the limitations of the standing doctrine beyond injury in fact are termed "prudential limitations" does not mean that the lower courts have discretion as to whether to apply these limitations or not. The Supreme Court has announced these prudential limitations in its supervisory capacity over the federal judiciary and, in the context of cases such as the one now before us, we believe there is a nondiscretionary duty to apply the limitations. This duty to apply the standard does not detract from the discretion involved in determining whether the standard has been satisfied.

been announced by the Court. The first of these limitations to be enunciated, and the one which will be the focus of our concern in Part B.2, *infra*, is the so-called "zone test:" [38] "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." [39] The two additional prudential limitations relating to causation [40] and redressability of the grievance [41] need not be faced in the context of this case. The application of the zone test to deny standing in this case bears out the notion that, as this court has stated, "a valid claim of standing rests on more than [the] assertion of [a judicially] cognizable injury." [42]

### B. *Competitor Standing*

▋ 1. *Injury in Fact.* We conclude that appellant Field has suffered injury in fact in his capacity as a competitor. [43] Al-

though appellant's economic injury is relatively small in magnitude, [44] this does not negate our finding of injury in fact. [45] Appellant Field has alleged "a distinct and palpable injury to himself" [46] which meets the requirements of Article III of the Constitution; given that the constitutional hurdle has been surmounted, we must now proceed to examine appellant's claim in light of the zone test. [47]

2. *Zone of Interests.* The zone test was announced and applied in 1970 in the companion cases of *Association of Data Processing Organizations v. Camp* [48] and *Barlow v. Collins.* [49] In addition, the test has been applied by the Court in two subsequent cases. [50] In applying the zone test in these four cases, the Court has not attempted a detailed explanation of the purpose, meaning, or scope of the standard. The deficiencies, ambiguities, and unresolved questions inherent in the zone test have been the

38. The "zone test" is not a "test" in the sense that it is capable of mechanical application to a set of facts with an easily discernible and certain result. Rather, it is, as this court has stated, one of a *"series of inquiries"* designed to determine if a particular party has standing. *Harrington v. Bush, supra* note 10, 180 U.S. App.D.C. at 60, 553 F.2d at 205 (emphasis in original). As an inquiry, the standard involves a great deal of discretion in its application. *See* note 64, *infra.* It is, therefore, for purposes of convenience that we refer to it as a "test;" this label is not intended to obscure the discretion and necessary ambiguity inherent in the inquiry.

39. *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

40. *See Linda R. S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1973). *See also Harrington v. Bush, supra* note 10, 180 U.S.App.D.C. at 60, 553 F.2d at 205 n.68.

41. *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 28, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 222, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). *See also Harrington v. Bush, supra* note 10, 180 U.S.App.D.C. at 60, 553 F.2d at 205 n.68.

42. *Harrington v. Bush, supra* note 10, 180 U.S. App.D.C. at 60, 553 F.2d at 205 n.68.

43. *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970).

44. The oil well owned by appellant Field is quite small; *see* Brief for Appellants at 11.

45. *See United States v. SCRAP*, 412 U.S. 669, 689 n.14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (identifiable trifle is sufficient for purposes of standing doctrine). The appellee's arguments to the contrary are frivolous; *see* Brief for Appellees at 10, 26–27.

46. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

47. *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 39 n.19, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

48. See note 32, *supra.* The *Data Processing* case also involved a claim of competitive injury.

49. 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

50. *Investment Co. Inst., v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970).

subject of voluminous criticism.[51] There has also been confusion in the application of this prudential standard in the courts.[52] Some courts have chosen to ignore the zone test;[53] at least one circuit court has chosen forthrightly to state its opposition to the test.[54] Perhaps the most common pattern is to announce in conclusory terms that the zone standard has or has not been satisfied.[55]

██ The zone test admittedly presents the courts with an ambiguous and imprecise standard to apply; such ambiguity and imprecision are certainly not foreign to the courts, however, and none of the approaches to the zone test outlined above has contributed to the clarification of the concept.[56] Suggestions that the zone test is no longer a constituent element of the standing doctrine are, in our view, clearly incorrect. Indeed, all of the available evidence in Supreme Court cases suggests that the zone standard remains the law in this context.[57] We believe that the zone test is fully applicable in this context; since we rest our denial of standing to appellant Field as a competitor squarely on the zone standard, we shall put forth in some detail the manner in which this decision has been reached.

██ a. *Purpose of Zone Test.* The zone test serves no independent purpose but, rather, constitutes one method to ensure that the basic purposes and policies of the standing doctrine itself are effectuated. Although the purpose of the standing doctrine has been the subject of considerable debate among the commentators,[58] the Supreme Court has been consistent in identifying two basic purposes of the doctrine. The first purpose, or basic policy, is to ensure the complete adversarial presentation of the issues before the court.[59] The second purpose concerns the "proper—and properly limited—role of the courts in a democratic society."[60] That is, the standing doctrine can be employed to define the proper judicial role relative to the other major governmental institutions in the society.[61] As the Court has stated, the "prudential rules of

**51.** A complete bibliography of these criticisms is set forth in Note, Standing to Challenge Exclusionary Land Use Control Devices in Federal Courts after *Warth v. Seldin,* 29 Stan.L.Rev. 323 (1977). (hereinafter referred to as Note).

**52.** *See, e.g., Pecos Ass'n v. Stans,* 452 F.2d 1233, 1235 (10th Cir. 1971) ("The interests are within the zone protected by the APA").

**53.** *See, e.g., Florida v. Weinberger,* 492 F.2d 488 (5th Cir. 1974).

**54.** *Park View Heights Corp. v. City of Black Jack,* 467 F.2d 1208 (8th Cir. 1972).

**55.** *See* K. Davis, *Administrative Law of the Seventies* 512 (1976).

**56.** *See* notes 52 to 54, *supra.* In another context, Justice Powell has recognized that the prudential limitations are "less easily defined" inquiries than those involving injury in fact. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (Powell, J., concurring in part and dissenting in part). The ambiguous nature of the prudential inquiries is not, without more, a valid reason to ignore the zone standard.

**57.** In all of the Supreme Court's standing decisions rendered since the zone test was announced in 1970 in which the zone standard has not been applied but in which it has been appropriate to make reference to this test, the Court has cited this standard with approval. *See Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *United States v. SCRAP,* 412 U.S. 669, 686 n.13, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *United States v. Richardson,* 418 U.S. 166, 176 n.9, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 224 n.14, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 39 n.19, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

**58.** *See* Note, *supra* note 51, at 335 n.72.

**59.** *See Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

**60.** *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

**61.** *See generally United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2490, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

standing . . . serve to limit the role of the courts in resolving public disputes." [62]

We believe that the zone test is particularly suited to the task of furthering the second stated purpose of the standing doctrine relating to the role of the federal judiciary. The zone test, by its very language, implicates the relationship between the legislative and judicial branches as the predominant factor in its operation—"the zone of interests to be protected or regulated by the *statute* . . . in question." [63] Thus, the zone test serves the purpose of allowing courts to define those instances when it believes the exercise of its power at the instigation of a particular party is not congruent with the mandate of the legislative branch in a particular subject area.

By its choice of language, the Supreme Court has indicated that the zone test is a quite generous standard; [64] on the other hand, the test is obviously meant to serve as a limitation on those who can use the federal courts as a forum for grievances emanating from agency action taken pursuant to a particular statutory mandate. These competing considerations serve to frame the bounds of a court's discretion in applying the zone test. The discretion of a court to deny standing on the basis of the zone standard is not undefined; the zone test limitation is grounded in Congressional action as embodied in statute. The zone test therefore cannot be used arbitrarily to deny access to the courts; it is based on discerned Congressional purpose, a purpose which can be more clearly or differently defined as Congress wishes.

The most severe difficulties with the zone test derive from questions as to the proper technique to employ in order to discern the Congressional intention in a manner which does not defeat other basic tenets of the law of standing. In particular, these difficulties revolve around the decision as to which statutory provision to examine for evidence of regulatory or protective intent and the proper role of legislative history in making the threshold decision on standing.

b. *Proper Statutory Provision.* The IRS rulings being challenged in this case were issued pursuant to Section 901 of the Code. The question then becomes: does the court look to this section of the statute (the Code) to determine which interests are arguably to be regulated or protected for purposes of the zone test, or should the court look to other sections of the statute for evidence of arguable regulatory or protective intent? The Supreme Court decisions dealing with the zone test do not provide a conclusive answer to this inquiry. [65] As will be seen, this decision is of particular significance in the context of this case. [66] Appellants urge us to adopt the second alternative—to examine statutory provisions other than those which form the basis for the lawsuit. [67] In this regard, appellants refer us to additional provisions in the Code which they believe contain the necessary evidence of Congressional intent sufficient to satisfy the zone test in this case. [68] We cannot agree with this approach; instead, we shall look only to Section 901 of the Code in our application of the zone test. Why we should do so readily becomes apparent.

Our decision to adopt this approach rests on two reasons—one general, the other with particular reference to the statutory scheme involved in this case. Generally, the statutory provision at issue in a given case, in this instance Section 901 of the

---

**62.** *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

**63.** *See* note 39, *supra.* (emphasis added).

**64.** The particular words which give the test this quality are "arguably" and "zone".

**65.** *See* cases listed at notes 48, 50, *supra.*

**66.** *See* text at notes 69 to 70, *infra.*

**67.** Appellants contend that we "must examine [the] general purpose" of the Code. (Brief at 20) to determine if the competitive interests "are within the zone of interests protected by the Internal Revenue Code." (Brief at 8). *See also* Brief for Appellants at 17–19.

**68.** These additional provisions of the Code are sections 501, 502, 511–13, and 7805(b).

Code, frames the substantive issue which a court will decide if the action proceeds to a determination on the merits. If the necessary arguable intent is found in the particular provision, this fact further ensures that the complaining party will have a strong connection to the controversy and that it will serve the policy of complete adversariness in the litigation which has as its focus the particular statutory provision.[69] If, on the other hand, standing is granted on the basis of intent inferred from statutory provisions which perhaps embody *different* goals and policies, this connection to the controversy may well be lessened. Therefore, as a general rule we believe that the particular statutory section should be the focus of analysis when applying the zone test.

The wisdom of this decision to examine the particular statutory section is particularly apparent in the context of this case. The Internal Revenue Code is a extraordinarily complex statute which does *not* have a single, unified purpose. Rather, the Code is intended to accomplish a wide variety of economic and social goals and purposes. If litigants are allowed to transfer the Congressional purpose and intent embodied in one section of the Code into other contexts and situations regulated by different provisions of the Code, the possibilities for litigation would indeed be endless. We do not therefore believe that litigants can "borrow" the arguable regulatory or protective intent embodied in one provision of the Code, and apply it to a provision where that intent is not evident, in order to satisfy the zone test. A contrary decision in this context would distort the role of the courts in relation to the legislative branch, precisely what the zone test serves to prevent, in the area of revenue collection.

In support of their argument that the court should look beyond the particular statutory provision, appellants refer us to

the decision of this court in *Constructores Civiles de Centroamerica, S.A. v. Hannah.*[70] In that case action taken pursuant to the Foreign Assistance Act of 1961 [71] was challenged. In determining that appellants in that case satisfied the zone test, the court looked to the general statement of policy found in the statute.[72] Appellants in this case contend that the court's reliance on the broad general language of the preamble in the *Constructores* case supports their view that purposes embodied in other sections of the Code support their standing under the zone test. The court's action in *Constructores* was not, however, inconsistent with the technique we have chosen to employ in this case. In *Constructores* it was acceptable to examine both particular and general provisions because these provisions shared an identity of purpose. Indeed, in this context, it was necessary to examine the general language of the preamble to ensure that a grant of standing would not be inconsistent with the statutory purpose. No such similar situation is presented in this case and we therefore confine our inquiry to Section 901 of the Code.

■ *c. The Role of Legislative History.* In the process of deciding disputes which are properly before them, courts regularly examine in some depth and in great detail the legislative history of statutes involved in the disputes. In the context of applying the zone test to the issue of standing, however, such full-scale examinations of legislative history present special dangers and should therefore be avoided.[73] The dangers and deficiencies in the traditional approach to legislative history in this context are three in number.

■ First, and most significant, a full-scale examination of the legislative policy underlying a statutory provision may well lead to a prejudgment of the merits of the case. A canvassing of the entire legislative

**69.** *See* text and notes at notes 58 to 59, *supra.*

**70.** 148 U.S.App.D.C. 159, 459 F.2d 1183 (1972).

**71.** 22 U.S.C. § 2251 et seq. (1970).

**72.** 148 U.S.App.D.C. 159, 459 F.2d 1183, 1188–89 (1972).

**73.** *See Barlow v. Collins,* 397 U.S. 159, 168, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (Brennan, J., concurring in the result and dissenting).

background may lead to a decision on the question of standing based on an assessment of the strength or weakness of the claims being presented.[74] Such a result or tendency would be inconsistent with a primary theme in the law of standing—that the question of standing is a matter apart and distinct from the merits of the substantive claims put forth.[75] It is totally acceptable to grant standing to a party to pursue an unsuccessful claim; a traditional examination of legislative history might well undermine this basic proposition.

■ Second, the question as to precisely which interests are meant to be regulated or protected by a statutory provision is not likely to have been faced in the legislative history in any convincing or dispositive manner. Rather, the express language of the statute is likely to be more accurate in this regard. Thus, as a source of evidence as to whether the particular interests of a particular plaintiff are within the relevant zone,[76] the legislative history is likely to be unilluminating.[77]

■ Third, a full-scale examination of legislative history presents the distinct possibility that the generous nature of the zone test, which results from the language of the test itself, will be undermined. Such an approach may lead to a requirement that there be affirmative evidence that the Con-

gress intended that a plaintiff situated precisely as the plaintiff then standing before the court be regulated or protected. Any tendency to move in this direction would detract from the flexibility of the zone standard provided by the requirement that the plaintiffs' interest be only "arguably" within the zone. Thus, if Congress had in general terms legislated against competition in a statute, it is not difficult to find that particular competitive interests, which may not have been mentioned in the legislative history at all, are "arguably" within the zone of interests.[78] The "arguable" language of the zone test thus serves to resolve potential ambiguities in the legislative history and obviates the need to consult it in the same detail as is done when the merits of the dispute are being resolved.

■ Given these deficiencies in the traditional techniques of fully examining legislative history, we believe the appropriate test to be as follows: whether the complaining party has stated an interest which is arguable from the face of the statute. Although the Supreme Court has not explicitly endorsed this as the appropriate operational technique, it has come close to so doing in one case.[79] Thus, we believe that this approach is both consistent with the guidance we have been given by the Su-

74. It was the fear of confusing the preliminary issue of *standing* with the *merits* which caused Justices Brennan and White in *Barlow v. Collins*, 397 U.S. 159, 168–170, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) to argue that examination of standing should stop with the constitutionally-spawned inquiry as to injury in fact and should not reach the "zone of interest" inquiry at all. By not relying on legislative history, as the Supreme Court indicated in *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 46, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970) was proper, we avoid the danger of the court settling the merits in the guise of ruling on standing and thus meet the concern voiced by Justices Brennan and White.

75. *See, e.g., Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

76. We are aware of the confusion surrounding the meaning of which interests are relevant to the zone test. *See* K. Davis, Administrative

Law Treatise § 22.00–1 (1970 Supplement). Essentially, the confusion surrounds what exactly has to fall within the relevant zone: 1) the parties themselves; 2) the interests of the partes in general; or 3) the particular interest the parties are asserting in the litigation. It seems clear to us that the particular interests are the relevant interests in the context of an application of the zone standard. Professor Davis agrees. *Id.*

77. The success of a workable standing doctrine must be measured in some degree by the ease with which it can be applied. This more limited role for legislative history at this threshold stage in litigation promotes this additional goal.

78. This is essentially what the Supreme Court did in *Arnold Tours v. Camp*, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970).

79. *Id.*

preme Court and that it is supportive of other policies underlying the standing doctrine.[80]

### C. Application of Zone Test to Appellant Field.

Having described what we believe to be the purpose of the zone test and the manner in which it should operate, it is now possible to formulate with precision the relevant zone test inquiry with respect to appellant Field's standing as a competitor: did Congress arguably legislate with respect to competition in Section 901 of the Code so as to protect the competitive interests of domestic oil producers?

We answer the posed query in the negative for the following reasons. The purpose of the tax credit provision of Section 901 of the Code is to prevent the double taxation of any United States companies operating abroad. This purpose is clear from the face of the statute itself, and has been consistently confirmed in the case law dealing with this particular provision in other contexts.[81] The tax credit envisioned in Section 901 is also available to U.S. companies operating outside the sphere of oil extraction and production, with the same purpose of avoiding the double taxation of United States taxpayers, whether such companies have domestic competition or not. Given this purpose, it is obvious that the protective intent of the statutory sec-

tion extends to all those U.S. companies doing business abroad and paying foreign income taxes.

In addition it cannot be said that parties in the position of appellant Field are arguably intended to be regulated by the provision granting tax credits; that is, appellant Field cannot be said to fall within the regulatory field of concern without stretching the concept of regulation to implausible limits.[82] Therefore, we conclude that the interests being asserted by Appellant Field as a competitor are not the interests arguably intended to be protected by the tax credit provision of section 901 which is the statutory basis for the challenge in this case. The congruence between the purpose of the statute (to prevent the double taxation of particular parties) and the interests asserted by appellant (competitive interest in fairness) is not sufficient to invoke the federal judicial power.[83]

We find it significant, as we noted earlier,[84] that appellants do not in their submissions to us attempt to persuade the court that appellant Field's asserted competitive interests fall within the zone of interests relevant to Section 901. Rather, appellants rely entirely on other provisions of the Code to argue that the zone standard has been satisfied.[85] We have rejected this approach and put forth our reasons for so doing in part II.B.2(b), *supra*. This failure to ad-

---

**80.** Having stated and justified this general approach to legislative history, it is necessary to state a *caveat*. We do not rule out *any* role for legislative history at this stage, and we would expect to be informed by the parties if the legislative history contained clear evidence of an intent either to allow the appellant's interests as a basis for standing or to deny standing to a party in this position.

**81.** *See, e.g., Burnet v. Chicago Portrait Co.,* 285 U.S. 1, 2, 52 S.Ct. 275, 76 L.Ed.2d 587 (1932); *Bank of America National T.&S. Ass'n v. United States,* 459 F.2d 513, 519, 198 Ct.Cl. 263 (1972), *cert. denied,* 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972); *Rinehart v. United States,* 429 F.2d 1286, 1288 (10th Cir. 1970); *Associated Tel. & Tel. Co. v. United States,* 306 F.2d 824, 832–33 (2d Cir. 1962), *cert. denied,* 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 498 (1962).

**82.** See text and notes at notes 86 to 89, *infra.* Appellant is not directly regulated by the rulings being challenged in this case. Rather, a more appropriate description is that he operates in an industry which is regulated by the rulings but does not operate in that sphere of the industry which is the object of the regulation.

**83.** *Cf.* cases cited at notes 48–50, supra; in these cases the congruence between the purpose of the statute (to legislate against competition generally) and the asserted interests (particular *types* of competition) was sufficient to satisfy the "arguable" terminology of the zone test.

**84.** *See* note 67, *supra.*

**85.** *See* note 68, *supra.*

dress the issue of the zone standard as it relates to the statutory provision being challenged suggests that a convincing argument in this regard is lacking. Perhaps the most appropriate way in which we can emphasize the strength of our decision to deny standing on the basis of the zone standard is to sketch out the arguments which would need to be made in order to satisfy the zone standard in this context.

The argument that appellant Field's interests fall within the relevant zone of Section 901 rests on the premise that Section 901 can arguably be read not only as a decision to grant a tax credit to those who have paid foreign income taxes but also as a decision *not* to grant a tax credit to those who have made other sorts of payments, such as royalties, to foreign governments.[86] Under this "reverse zone of interest" analysis, competitors such as appellant Field could argue that they fall within the zone protected by the negative implication of the statutory provision.

We cannot accept this "reverse zone of interest analysis" which would extend standing to all those who may be able to allege injury because they were *not* regulated or protected by a particular statutory provision. Such an approach would render the zone standard meaningless. Although the test is a generous one, the terms "arguable" and "zone" are subject to definition in the context of particular factual situations such as presented in this case. To define the terms by reference to what they do not mean in these factual settings is clearly inappropriate.

█ There is one further argument concerning the zone of interests surrounding Section 901 which deserves mention. It can be argued that the decision to grant the international companies a tax credit has competitive *consequences* for parties such as appellant Field which bring him within the relevant zone. That is, since the challenged rulings have an *impact* on appellant Field in his capacity as an oil producer, he must therefore fall within the intended zone of Section 901. Every decision by a government agency generates consequences and various forms of impact on a wide range of valid interests held by a diverse range of parties. There is no doubt that the decisions embodied in the challenged revenue rulings have had an impact on appellant Field. But the concepts of *consequence* and *impact* are not the proper guideposts to define the relevant zone of interests; reference to these concepts does not aid greatly in determining whether a protected interest exists, but rather serve as part of the vocabulary in defining the relationship between an alleged injury and an asserted interest.

Thus, *consequences* and *forms of impact* do play an important role in the law of standing; these concepts are relevant in determining whether there has been *injury in fact*. So, we have not ignored the competitive consequences and impact of the challenged rulings on appellant Field; we have taken these into account in determining that appellant has suffered competitive injury in fact. A standing determination, such as the one involved with appellant Field as a competitor, involves separate stages of analysis;[87] we cannot simply transfer the analytical concepts employed in one stage (injury in fact) to the other stages of analysis dealing with prudential limitations. We cannot define the zone of interests as being the equivalent in every case of the "zone of impact" or the "zone of consequences." To do so would establish a standing doctrine based solely on the existence of harm to a party; it is clear that, under current Supreme Court doctrine which we are obliged to apply, such a result is unacceptable[88] as contrary to the stated purposes of the doctrine.[89]

---

86. This seems to rest on the misapprehension that the statute is directed exclusively at the tax scheme and problems of the petroleum industry, which we pointed out above was not so.

87. *See Harrington v. Bush, supra* note 10, 180 U.S.App.D.C. at 60, 553 F.2d at 205 n.68.

88. *Id.*

89. *See* notes 59 and 60, *supra.*

In summary, we cannot look to a "reverse zone of interests" or to the consequences and impact of the challenged agency action to define a zone within which appellant Field's competitive interests fall. Rather, we must make our decision as to whether the party before us is an intended beneficiary of the statutory provision on the basis of the interests we believe Congress arguably intended to regulate or protect in the legislation. We cannot conclude that Congress arguably intended to regulate or protect the competitive interests of appellant Field in Section 901. The existence of competitive ramifications flowing from the challenged agency action is not sufficient evidence to infer that Congress arguably intended to protect or regulate competitive interests. The arguments to the contrary fail for the reasons cited above. Without a clearer indication from Congress from which could be constructed a plausible argument that the competitive interests are "arguably" to be regulated or protected, we cannot as a prudential matter make the federal courts available as a forum for third-party challenges to IRS action such as the one presented here.[90]

## CONCLUSION

We recognize that as the result of our decision in this case it is likely that the revenue rulings at issue in the case may go unchallenged in federal court due to the lack of a proper party to sue. This eventuality does not, however, operate in favor of granting standing to the parties in this case.[91] The standing doctrine should not be manipulated to guarantee that there is a party to bring any action in court that some persons may think desirable to have adjudicated. Since we cannot conclude that appellants have standing under the current framework of analysis provided by the Supreme Court, the order of the District Court in this case is

*Affirmed.*

[For dissenting opinion of Chief·Judge Bazelon see 184 U.S.App.D.C. ——, 566 F.2d 145.]

---

**90.** A similar challenge to an IRS ruling was made in *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Indeed, this case was held in abeyance by order of this court to await guidance from the Supreme Court in this area. In *Simon*, however, the Court denied standing on grounds not relevant to this case.

The Court in *Simon* explicitly chose "not [to reach] the question of whether a third party ever may challenge IRS treatment of another . . . ." 426 U.S. at 37, 96 S.Ct. at 1923. The appellee in this case has urged us to adopt such a blanket prohibition (Brief for Appellees at 37–43), but we, too, decline to speak to this issue.

