**FOREST HILLS EARLY LEARNING CENTER, INC. et al.**

v.

**William LUKHARD etc.**

Civ. A. No. 79-0773-R.

United States District Court,
E. D. Virginia,
Richmond Division.

Nov. 6, 1979.

Hullihen Williams Moore, Dennis O. Laing, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., John Vanderstar, Covington & Burling, Washington, D. C., for plaintiffs.

Martin A. Donlan, Jr., Asst. Atty. Gen. of Va., Richmond, Va., for defendant.

## MEMORANDUM

WARRINER, District Judge.

This action was filed by three secular day care centers operating in the Commonwealth of Virginia against William Lukhard in his capacity as Director of the Department of Welfare and Institutions for the Commonwealth. Declaratory and injunctive relief is sought. The complaint challenges § 63.1–196.3 of the Code of Virginia, which became effective 1 July 1979. This statute exempts all child care centers "operated or conducted under the auspices of a religious institution" from State licensing standards otherwise required by § 63.1–196 of the Code. The exemption is challenged on constitutional grounds as a denial of the right of non-exempt child care centers to equal protection of the laws, and as an establishment of religion, in violation of the Fourteenth and First Amendments to the United States Constitution, and of Article I, § 16 of the Constitution of Virginia. Each of the named plaintiffs owns and operates one or more child care centers in Virginia under license issued by defendant pursuant to § 63.1–196. Neither of the three centers is operated under the auspices of a religious institution.

The licensing standards required by defendant Lukhard are intended to promote the health, safety, and welfare of children who are entrusted to day care centers by their parents. The regulations deal with such things as staff/child ratios, specified amounts of indoor and outdoor play space per child, isolation of sick children, record keeping, food preparation, nutrition, play materials, cleanliness, and the like. Inspections to enforce compliance are provided for under the regulations. Revocation for failure to comply may be ordered by the Director.

The exemption, by contrast, permits day care centers operated by religious organizations to disregard the regulations although

certain staffing, fire, and safety provisions may be enforced by the Commonwealth through court action upon complaint from a parent.

Plaintiffs allege that this exemption grants to church affiliated day care centers "an opportunity to derive substantially eco-. nomic benefits." They allege that "non-compliance with standards will give exempt centers a significant competitive advantage in the marketplace against plaintiffs." The heart and rationale of plaintiffs' case is found in paragraph 13 where they alleged, "[i]n the absence of such regulations, the inevitable pressures of the marketplace [will] lead to the relaxation of [health and welfare] safeguards."

Defendant Lukhard has moved to dismiss the complaint on the ground that plaintiffs lack standing under Article III of the United States Constitution to prosecute the action. The briefing has been completed and the motion to dismiss is ripe for decision. An appropriate approach to the decision is first to analyze the allegations of the complaint and then to attempt to discover from the decided cases a proper disposition.

Though the complaint is not set out above in its entirety, its essence is. It is clear to this Court that plaintiffs have not (and cannot) allege that they or either of them have or will be injured by the statute attacked. It is equally clear that they think they will be injured but the Court is forced to conclude that their apprehensions are more likely the result of a faint heart rather than "some threatened or actual injury resulting from the putatively illegal action . . .." *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973).

Plaintiffs believe and allege that if the secular day care centers are subjected to regulations by the Commonwealth while the church related day care centers are exempt, "the inevitable pressures of the market-

place [will] lead to the relaxation of [health and welfare] safeguards," by the exempt day care centers. This statement is far from self-evident.[1] Indeed it is the antithesis of the theory of competition. The history of competitive capitalism in this country and wherever else it has been allowed to pour forth its beneficence has disproved plaintiffs' statist expectations.

Be that as it may, plaintiffs' claims of injury or harm, threatened or real, are pure speculation. The very opposite of plaintiffs' prediction may result. It may be that the unregulated day care centers, *because* they are unregulated, will lose the confidence of parents and will fail to attract customers to their enterprise. In such a case the non-regulated centers may be forced to alter their approach and to voluntarily conform with the regulation, thus ending any disparity. On the other hand, regulation of the secular day care centers may cause their service to customers to deteriorate. Obliged to concentrate on meeting the demands imposed by the Commonwealth, they may very well loose their competitive edge, fail to innovate, and end up by taking on the enervating trappings of a government operated enterprise.[2]

No one knows what the scenario will be. Plaintiffs cannot, at this time, say whether they or any regulated day care center will be injured. Indeed if the State-imposed regulations are well received and appropriate, *i. e.* they are what parents want for their children, then the regulated centers should soon have all the business, leaving churches to revert to concerns about daily vacation Bible school and the like.

This factual analysis must now be viewed in the light cast by cases dealing with Article III constitutional standing within the concept of "the proper—and properly limited—role of the courts in a democratic society," *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The

---

1. For a capsule summary of the case that plaintiffs' thesis is not only self-evident, but is instead false, *see* Alfred E. Kahn, *Economics of Regulation*, Vol. I, p. 18 (John Wiley & Sons, Inc. 1970).

2. One cannot help comparing the United States Postal Service's parcel post system with the United Parcel Service.

Court will turn to the pertinent cases dealing with "injury in fact."

Two of the more recent cases cited by counsel were decided by the United States Court of Appeals for the District of Columbia. One of the cases found no cognizable injury in fact, *American Society of Travel Agents, Inc. v. Blumenthal*, 184 U.S.App. D.C. 253, 566 F.2d 145 (D.C.Cir.1977), *cert. denied*, 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978), while the other found injury in fact, but denied plaintiffs' standing based upon prudential considerations, *Tax Analysts & Advocates v. Blumenthal*, 184 U.S.App.D.C. 238, 566 F.2d 130 (D.C.Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). *Travel Agents* was a "tax" case and courts have been especially wary of finding standing to contest the collection or expenditure of tax monies. But the analysis in *Travel Agents* did not center on the tax aspect of the case. Judge McGowan for the majority analyzed plaintiffs' standing on the basis of constitutional considerations.

> We do not reach the merits, because we believe appellants have not alleged any judicially cognizable 'injury in fact,' and thus have failed to establish their standing to bring this suit. 'Injury in fact' has long been regarded as the foremost standing prerequisite, and the only one of constitutional dimension. Under Article III of the Constitution, federal courts are limited to the adjudication of cases and controversies. In order to guarantee the adversarial litigation posture demanded by this constitutional language, plaintiffs seeking to invoke federal court jurisdiction have been required to demonstrate that they have suffered some actual injury attributable to defendants. (citations omitted)

*American Society of Travel Agents, Inc. v. Blumenthal*, 566 F.2d at 148.

It is true that Judge McGowan felt compelled to distinguish *Association of Data Processing Ser. Org., Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), in part because *Data Processing* was not a tax case. Yet it is abundantly clear that on a claim of government mandated "unfair competition" the D.C. Circuit found, on allegations similar to those here, no Article III standing to sue. The travel agent plaintiffs complained that church affiliated organizations were in direct competition with them in arranging tours. Church affiliated organizations were exempt from certain taxes imposed upon the travel agents. Thus the church affiliated tour organizations allegedly enjoyed a competitive advantage. Judge McGowan's analysis, focusing on the speculative nature of plaintiffs' claims of injury, includes many of the factors present in this case.

Though not a companion case, *Tax Analysts & Advocates v. Blumenthal*, 184 U.S. App.D.C. 238, 566 F.2d 130 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), was decided by a different panel some three months before *Travel Agents*. The Court in *Tax Analysts* found injury in fact to a competitor complaining of an IRS regulation allegedly favoring his competition. Unfortunately, the injury in fact there complained of was not analyzed in the opinion and this Court cannot clearly determine the reasons for the Circuit Court's conclusion. In any event, no allegation in the instant case discloses any injury in fact—speculation aside—when one considers the currents and cross-currents of competitive forces between regulated and unregulated competitive day care centers.

A useful tool in determining the existence of injury in fact, and hence the existence of Article III standing, is revealed by *Singleton v. Wulff*, 428 U.S. 106, 112–13, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). The existence or non-existence of injury in fact may sometimes be revealed by an examination of what will result if plaintiff prevails. The Court noted in *Singleton*:

> If the physicians prevail in their suit to remove this limitation, they *will* benefit, for they *will* then receive payment for the abortions. The State (and Federal Government) *will* be out of pocket by the amount of the payments. (emphasis added)

*Id.* at 113, 96 S.Ct. at 2873.

Contrasted with the certainty of benefit and detriment existing in *Singleton*, a cer-

tainty which pointed to standing, no one knows (and no one will ever know) what benefits plaintiffs may gain if they prevail in this case. Nor can it be predicted what detriments will be suffered nor who will suffer the detriments—perhaps the children?[3]

Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), is the most encompassing study of standing within the past decade. Without going into the several aspects of the problem presented by that case, suffice it to say that nothing in Warth can properly be construed as giving plaintiffs herein grounds to assert standing. It is argued, however, that the later case of Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), should be read as limiting or even encroaching upon Warth. This Court does not concur. The Arlington Heights analysis was specifically predicated upon the holding in Warth, 429 U.S. at 264, 97 S.Ct. 555. Further, the injury in fact in Arlington Heights was clear and direct. It is true that the injury there depended upon contingencies. But the injury did not depend upon speculation. If one has a contract to purchase a tract of land with the intent to build upon it if a loan can be obtained, a denial of zoning for the building injures one directly. That, in essence, was the situation in Arlington Heights. That situation cannot be considered analogous to the unknown and unknowable consequences of the regulation/non-regulation juxtaposition complained of here.

This case is unlike Arlington Heights. It is more like Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). In the instant case the plaintiffs allege, in effect, that the regulatory exemption permits or encourages certain day care centers unfairly to compete with plaintiffs. In Simon the allegation was that by adoption of Revenue Ruling 69–545 defendants had encouraged certain hospitals to deny services to plaintiff indigents. Mr. Justice Powell, for the majority, noted that if plaintiffs were granted the requested relief, the withdrawal of the Revenue Ruling, one could not determine whether plaintiffs would or would not receive the desired hospital services.[4] 426 U.S. at 42–43, 96 S.Ct. 1917; see American Society of Travel Agents, Inc. v. Blumenthal, 566 F.2d at 148–49.

So here, if the relief sought be granted plaintiffs, it would be pure speculation as to whether the result would or would not accomplish plaintiffs' purpose. What effects the granting of relief to plaintiffs might have on others in interests are even more chimerical. What practices the church related day care centers will adopt without regulation is unknown. Plaintiffs surmise that it is "inevitable" that lack of regulation will lead to a "relaxation" of safety and health standards. With their foundation bottomed firmly on this speculation, plaintiffs further surmise that parents will then be so enamored of this lessened protection for their children that they will patronize the unsafe and unhealthy day care centers and shun the safe and healthy regulated ones. This paradox may turn out to be a correct vision of the future. But at this point it is no more than a supposition, a surmise, a speculation. The string of speculations in this case exceed in their ambigui-

---

3. The Court does not here consider that the regulations were presumably intended to benefit children and their parents and that the exemption presumably was intended to benefit children, their parents, and their church. Since plaintiffs are none of these entities, questions as to their standing to litigate rights of third parties might be involved. See Singleton v. Wulff, 428 U.S. 106, 113–18, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Nor does the Court consider the impact of religious preferences by parents which might take precedence over all other considerations.

4. The Court in Simon held specifically that

when a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation.

426 U.S. at 38, 96 S.Ct. at 1924.

ty the speculations which doomed plaintiffs' constitutional standing in *Simon.* 426 U.S. at 42–44, 96 S.Ct. 1917.

Plaintiffs' strongest argument centers around the holding in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Mr. Justice Douglas in a characteristically brief opinion held that a data processing firm had Article II standing as a competitor to sue a bank and the Comptroller of the Currency for injury incurred when the Comptroller permitted banks to sell data processing services in competition with plaintiff. Mr. Justice Douglas' scant analysis makes distinction difficult, but it may be noteworthy that the challenged regulation created competition where none had existed, there were allegations of actual loss of specific customers, and the bank to whom the customers were lost was listed as a party defendant. Whatever the distinctions may be the Supreme Court's later, careful, and extensive discussions of the problem, notably by Mr. Justice Powell, leave no doubt in this Court's mind that plaintiffs here lack standing to sue under presently applicable caselaw.

Two other relatively minor aspects of the matter should be dealt with. First, plaintiffs charge that the exemption violates the First Amendment establishment clause. Though this is a serious charge and a serious concern, the merits or seriousness of the illegality charged is not a factor to be considered in a standing case. *Flast v. Cohen,* 392 U.S. 83, 99–102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Second, plaintiffs seek to represent a class of secular day care centers. While it is conceivable that some proprietary day care centers somewhere in the Commonwealth may suffer competitive disadvantage from nonregulated religious day care centers, plaintiffs here cannot assert these claims. *See Tileston v. Ullman,* 318 U.S. 44, 66 S.Ct. 493, 87 L.Ed. 603 (1943); *see also Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *East Texas Motor Freight System, Inc. v. Rodriquez,* 431 U.S. 395, 403–04, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

Finally, although *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), is not otherwise directly on point, its discussion of the dangers inherent in deciding cases where injury in fact cannot concretely be alleged is applicable here, 418 U.S. at 220–22, 94 S.Ct. 2925. That case invited conflict between the Judicial, the Legislative and the Executive branches of the national government. This case invites confrontation between the Commonwealth of Virginia and the federal judiciary. Where such conflict is inevitable it must be accepted by the courts. But here plaintiffs seek to avoid a supposed competitive business disadvantage by recourse to the equal protection and religious establishment clauses of the federal and State constitutions. Prudential considerations, *Flast v. Cohen,* 392 U.S. at 131, 88 S.Ct. 1942 (Harlan, J. dissenting), dictate that this Court venture into the fray only if it is duty bound to do so. No such duty exists in this case.