SOUTHERN MUTUAL HELP ASSOCIA-
TION, INC., Appellant,

v.

Joseph A. CALIFANO, Jr., Secretary of
Health, Education and Welfare, et al.

No. 76–1748.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 30, 1977.

Decided Dec. 23, 1977.

Robert Stulberg * and Brenda F. Kohn,* with whom Robert S. Catz, Washington, D. C., was on the brief, for appellant.

Richard A. Graham, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty. and John A. Terry and Paul M. Tschirhart, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellees.

Before: BAZELON, Chief Judge, and TAMM and WILKEY, Circuit Judges.

Opinion for the court filed by TAMM, Circuit Judge.

---

TAMM, Circuit Judge.

Appellant Southern Mutual Help Association (SMHA) commenced this action in the United States District Court for the District of Columbia, challenging a decision by the appellee Secretary of Health, Education and Welfare (HEW) to disapprove, after three years of federal support, an annual application submitted to obtain continued funding for appellant's migrant worker health care facility in Franklin, Louisiana. The Secretary took this action without providing SMHA the opportunity for a hearing. The district court granted the appellee's motion for summary judgment, holding that neither HEW regulations nor the due process clause of the fifth amendment required HEW to hold a hearing. We vacate the order of the district court, and remand to that court with the instruction to remand to the Secretary for further proceedings consistent with this opinion.

## I

Under authority of the Migrant Health Act (section 310 of the Public Health Service Act), 42 U.S.C. § 242h (1970),[1] the Secretary of HEW awards grants to public and other nonprofit organizations to establish and operate family health service clinics for domestic agricultural migratory workers. Generally, the "Project Period System" is used to obligate funds for such grants. Under this system, projects are approved for multi-year support, but are funded in annual increments called budget periods. Grantees must file annual, noncompeting applications for continued funding, and HEW "is committed to fund the project in succeeding budget periods, subject to the availability of funds, unless the grantee fails to comply with the terms and conditions of the grant or [HEW] determines that continued funding is not in the best interest of the Government."[2]

---

* Entered an appearance as student counsel pursuant to Rule 20 of the General Rules of this court.

1. The Act was extensively revised in 1975, *see* 42 U.S.C. § 247d (Supp. V 1975), but the changes are not relevant to the issues in this case. All references, therefore, will be to the 1970 version of the Act.

2. HEW Grants Administration Manual § 1–85–10 (1972), Joint Appendix (J.A.) at 153.

In 1971, SMHA, a nonprofit Louisiana corporation, was awarded a grant to provide health services to migrant farm workers and sugarcane cutters in southwestern Louisiana. Attached to the letter informing SMHA of its grant was an HEW form entitled "Notice of Grant Awarded."[3] In pertinent part, it contained the following data:

```
       *    *    *    *    *    *
Project Period        7/1/71–6/30/76
Grant Period          7/1/71–6/30/76
       *    *    *    *    *    *
Budget Period         7/1/71 through 6/30/72
       *    *    *    *    *    *
Total Approved Budget     $204,584
       *    *    *    *    *    *
```

Future Support Recommended

| Budget Period | Amount |
|---|---|
| (72) 7/1/72–6/30/73 | $286,060 *** |
| (73) 7/1/73–6/30/74 | 321,966 *** |
| (74) 7/1/74–6/30/75 | 341,162 *** |
| (75) 7/1/75–6/30/76 | 363,328 *** |

```
       *    *    *    *    *    *
```
*** Future support is subject to the availability of funds.
```
       *    *    *    *    *    *
```

In 1972 and 1973, SMHA filed the required applications for continued funding, and each was approved. A revised "Notice of Grant Award" form was attached to each, and in pertinent part, the 1973 document indicated the following:[4]

```
       *    *    *    *    *    *
Project Period      7/1/71 through 6/30/76
Budget Period       7/1/73 through 6/30/74
       *    *    *    *    *    *
Total Approved Budget     $298,403
       *    *    *    *    *    *
```
Recommended Future Support (Subject to availability of funds)

| Budget Period | Total Direct Costs |
|---|---|
| 7/1/74–6/30/75 | $341,162 |
| 7/1/75–6/30/76 | 341,162 |

```
       *    *    *    *    *    *
```
Significantly, there is no mention on the document of "grant," "grant period," or "grant expiration date." The document does, however, indicate HEW's concern over the fact that SMHA had not yet established a project policy board, designed to promote greater community participation in the project, as required by HEW regulations.[5]

In November 1973, HEW instituted its first comprehensive fiscal audit of SMHA. The results of this audit were released on May 22, 1974, and SMHA was advised that it had thirty days to present "any comments or additional information that [it] believe[d] may have a bearing on [HEW's] final determination."[6] On June 6, 1974, SMHA was notified that its 1974 application for continued funding was not being approved, and that the funds instead were to be awarded to a competing applicant, Teche Action Board (TAB).

Stating that it was "unable to find sufficient merit in the continuation of the somewhat cumbersome and unresponsive project administration through SMHA," HEW listed six principal areas of major concern that prompted its decision:[7]

1. It is apparent from the considerable amount of correspondence this office has received from individuals and groups located in the Saint Mary Parish area, telephone communications and personal discussion between my staff and interested citizens from the target area that the community has lost confidence in SMHA.

2. SMHA has failed to reconstitute its Board of Directors or to make appropriate provision for the community at large, particularly the target population, to participate in the planning, development and implementation of the project.

3. The sponsor has failed to give consideration to the advice and counsel of the medical and dental committees on Saint Mary Parish, the primary focus of the project's activities.

4. There appears to have been usurpation of the Project Director's administrative and management authority by the Executive Staff of the Southern

---

3. J.A. at 84–85.

4. Id. at 36–37. The 1972 document is identical in format to the 1973 document. Id. at 34.

5. Id. at 36–37; see 42 C.F.R. § 56.105 (1973).

6. Record Entry 23, Exhibit 18.

7. J.A. at 38–39.

Mutual Help Association in respect to the negotiation of contracts, i. e., purchase of film, obtaining consultants for staff and board training. Also it is apparent that employment procedures and practices have not been consistent with program guidelines and requirements.

5. The Farm Workers Advisory Board, Professional Advisory Committee and project staff have indicated that they have had virtually no communication with the SMHA Executive Staff or the governing board of SMHA.

6. Of particular concern is the practice of SMHA which allows members of the Board and/or relatives of Board members to work as salaried staff for SMHA-sponsored programs and projects. This creates a basic conflict of interest.

On June 11, SMHA notified HEW that it intended to challenge and appeal the denial decision.[8] On June 25, HEW gave final approval to the TAB proposal,[9] and the next day informed SMHA that "our administrative decision not to renew this grant at the end of the budget period does not constitute grant termination. Therefore, those rules and regulations governing grant termination procedures . . . do not apply in this instance." [10] On July 16, representatives of SMHA met with the HEW regional health administrator to discuss the denial decision, and thereafter this official informed SMHA that the decision would not be altered.[11]

SMHA then formally applied for review to the HEW Grant Appeals Board,[12] but was informed that

> the decision being appealed is not subject to the jurisdiction of the Board. For the purposes of 45 CFR Part 16 the failure to issue an additional grant in support of a project is not a termination of an existing grant. It is viewed rather as a pre-award decision related to an application for the additional grant . . . .[13]

On August 28, 1974, SMHA filed its complaint in the district court, seeking, under 28 U.S.C. § 1331(a) (1970), declaratory and injunctive relief and money damages.[14] Among other causes of action, SMHA maintained that departmental regulations, the Administrative Procedure Act (APA), and the due process clause of the fifth amendment required HEW to provide a hearing prior to deciding not to provide funds for fiscal years 1975 and 1976.[15] The court disagreed with SMHA and granted HEW's motion for summary judgment, stating that it appeared SMHA "was not entitled to an evidentiary hearing before [HEW] on its entitlement to funding of its migrant health services program past June 30, 1974 . . . ." [16] This appeal ensued.

---

**8.** *Id.* at 41–42.

**9.** Record Entry 23, at 33, Answer to Interrogatory 85; *see id.*, Exhibit 23.

**10.** J.A. at 45–46.

**11.** *Id.* at 47.

**12.** *Id.* at 50–56.

**13.** *Id.* at 60.

**14.** On March 31, 1975, SMHA filed an amended complaint, *see id.* at 69, which is, of course, the controlling pleading in this appeal. *See* Fed.R. Civ.P. 15(c).

**15.** J.A. at 69–70, 80. SMHA also contended that the Secretary acted in an arbitrary and capricious manner in reaching the denial decision, and that the decision was in retaliation for SMHA's exercise of its right of free speech under the first amendment. *Id.* at 81. The district court explicitly rejected the former contention, *id.* at 196, but did not address the latter. While our disposition of this case is such that we need not address either of these issues, we do express concern at evidence in the record that indicates at least the possibility that SMHA's social activism, particularly labor organizing, contributed to the ultimate adverse decision under scrutiny here. *See* Deposition of Sister Anne Catherine Bizalion, July 15, 1975, at 25–47, 55–59, 62–63, 104–09; Record Entry 8, Affidavit of Sister Anne Catherine at 6–11; *id.*, Exhibit 15 ("The Society," *Saturday Review*, May 6, 1972), at 42; *id.*, Exhibit 17, at 7, 9; *id.*, Exhibit 19 (*The Sugar Bulletin*). *See generally* Cahn & Cahn, *The New Sovereign Immunity*, 81 Harv.L.Rev. 929, 930–34 (1968) [hereinafter cited as Cahn & Cahn].

**16.** J.A. at 196.

## II

Before beginning our analysis in this case, a few preliminary comments appear to be in order. In the two decades immediately preceding the award to SMHA, federal expenditures for grants increased tenfold, from $2.4 billion in 1951 to $27.6 billion in fiscal year 1971.[17] In the next four years, the grant total almost doubled, reaching approximately $52 billion in 1975.[18] The number and variety of federal assistance programs have also expanded, with estimates as to the number of individual domestic grant programs ranging from 500 to over 1000.[19]

This spectacular expansion of both the size and scope of grant programs has engendered surprisingly little case law on the administration of federal grants. However, there is no doubt that an ever increasing number of cases in this area will be presented,[20] especially to this court with its unique jurisdiction over many grant-dispensing agencies. While there currently is a need for a fuller body of law concerning this slumbering giant, we must exercise the restraint required of us and continue to apply the law then extant to the facts of each individual case. With these prefatory comments in mind, we turn now to the issues presented in this appeal.

## III

■ With a high degree of acumen, but seemingly little conviction, HEW has, in a single sentence and footnote, challenged SMHA's standing to bring this suit.[21] HEW correctly notes that the program in question was created primarily to benefit migrant workers. The issue, therefore, as pursued in exacting detail by Judge Wilkey at oral argument, is whether SMHA can demonstrate standing in a situation where health services for the migrant workers continued without interruption when TAB was substituted for SMHA. Since the question of standing goes to this court's jurisdiction, we must decide the issue even though the district court did not comment on it. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969) (principal opinion) (Marshall, J.), *citing Flast v. Cohen*, 392 U.S. 83, 94–101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). *See also Tileston v. Ullman*, 318 U.S. 44, 46, 63 S.Ct. 493, 87 L.Ed. 603 (1943).

■ In *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), the Supreme Court reemphasized the constitutional limitation of federal court jurisdiction to actual cases or controversies. Standing, of course, is a vital part of this limitation, and "when a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Id.* at 38, 96 S.Ct. at 1924.

The only claim before us in this appeal concerns SMHA's entitlement to a hearing. Although the final fiscal year indicated on the various grant documents ended over seventeen months ago, providing SMHA with a hearing would not be an idle gesture, for reasons that follow.[22]

---

**17.** Tomlinson & Mashaw, *The Enforcement of Federal Standards in Grant-in-Aid Programs: Suggestions for Beneficiary Involvement,* 58 Va.L.Rev. 600 (1972) [hereinafter cited as Tomlinson & Mashaw].

**18.** Boasberg & Feldesman, *The Washington Beat: Federal Grant Law & Administration— Recent Developments,* 7 Urb.Law. 556 (1975) [hereinafter cited as Boasberg & Feldesman].

**19.** *Compare* Boasberg & Feldesman, *supra* note 18, at 556, *with* Tomlinson & Mashaw, *supra* note 17, at 600.

**20.** *See* Carrington, *Crowded Dockets & the Courts of Appeals: The Threat to the Function of Review & the National Law,* 82 Harv.L.Rev. 542, 548–49 (1969).

**21.** Brief for Appellee at 24 & n.17. In its Answer in the district court, HEW stated an indirect, one-sentence challenge to standing as its first defense: "The Court lacks subject matter jurisdiction." J.A. at 90.

**22.** At oral argument, counsel for SMHA stated that SMHA's eventual, post-hearing goal was to secure reinstatement of the last two years projected by the documents described above.

SMHA brought this action, in part, under section 10 of the APA, 5 U.S.C. § 702 (1970), which gives a right to judicial review to any person "adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . ." In *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the Supreme Court "held the constitutional standing requirement under this section to be allegations which, if true, would establish that the plaintiff had been injured in fact by the action he sought to have reviewed." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. at 38, 96 S.Ct. 1917. In the *Data Processing* decision, the Court also established a nonconstitutional, prudential standing requirement that the interest sought to be protected by the plaintiff is "arguably within the zone of interests to be protected or regulated" by the statute in question. 397 U.S. at 153, 90 S.Ct. at 830. Although this "second prong" of the *Data Processing* standing test has been the subject of much criticism,[23] it has never been expressly repudiated by the Supreme Court, and it is certainly not for us to ignore a holding of that Court. We will first address the "zone" test, then proceed to a discussion of injury in fact.

In *Tax Analysts & Advocates v. Blumenthal*, 184 U.S.App.D.C. 238 at 248, 566 F.2d 130, 140 (1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), this court noted that, while the zone test is obviously meant to serve as a limitation on those who can use the federal courts to challenge agency actions, it is "a quite generous standard," using as it does the terms "arguably" and "zone." The statutory framework to be scrutinized under this generous standard in the instant case includes the Migrant Health Act, 42 U.S.C. § 242h (1970), and HEW regulations issued under authority of that Act. The statute states that migrant health grants are to be made "to public and other *nonprofit agencies, institutions, and organizations* . . ." (emphasis added). This explicit reference to nonprofit groups indicates that, while Congress clearly intended that migrant workers should benefit from the funds appropriated under this Act, it also recognized that conduit organizations such as SMHA were necessary to deliver the services contemplated. In consideration of this fact, HEW promulgated regulations, 45 C.F.R. Part 16, establishing a departmental grant appeals process designed "to afford to aggrieved grantees maximum due process . . . in disputes [with] the agency."[24] Because organizations such as SMHA are such an integral part of the migrant health program, therefore, we have no trouble concluding that SMHA's interest is arguably within that zone of interests protected or regulated by the statutory framework under scrutiny here.

As is usually the case, however, the injury in fact requirement presents a more difficult question. The characteristics of an injury in fact, although not always amenable to facile application, are relatively well established.[25] While the injury cannot be abstract, *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), it need not be significant; an identifiable trifle will suffice. *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). However, the injury must be specifically alleged by the plaintiff, *see Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), it must be particularized, *Schlesinger v. Reservists*

We are of the view that this remedy no longer exists, since those fiscal years have passed, and health services were provided by TAB from the appropriated funds. Further, we believe that any discussion of SMHA's claim for money damages is premature until the results of the hearing are known.

23. K. Davis, Administrative Law of the Seventies § 22.02–11, at 509–16 (1976); *see id.*

§ 22.00–7, at 181 (Supp.1977); Note, 29 Stan.L. Rev. 323 (1977).

24. 37 Fed.Reg. 24675, 24676 (1972).

25. *See Public Citizen v. Lockheed Aircraft Corp.*, 184 U.S.App.D.C. 133 at 139, 565 F.2d 708, 714 (1977).

*Committee to Stop the War*, 418 U.S. 208, 220–22, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), and it must be capable of direct redress by the court through the requested remedy, *see Linda R. S. v. Richard D.*, 410 U.S. 614, 617–19, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). Finally, the injury must be fairly traceable to the challenged action of the defendant. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. at 41, 96 S.Ct. 1917.

█ While SMHA has alleged a number of particularized injuries,[26] the one that is capable of direct redress by this court through the requested remedy, and clearly traceable to the action by HEW, is the assertion by SMHA that its good name and reputation have been damaged.[27] For an organization such as SMHA, dependent as it is upon grants for its very existence, a good reputation is perhaps its most valuable asset. Reputation, especially that established by past performance, is a key element in agency grant decisions, and an organization that acquires a bad reputation in the grant community based on poor performance will have a difficult burden to overcome in securing new grants.[28]

The fact that an injury to the reputation of an organization such as SMHA can serve as a basis for standing has been recognized at least since *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (plurality opinion). In that case, the Supreme Court stated that the effect of designating the complaining organizations as "Communist" was to "cripple the functioning and damage the reputation of those organizations in their respective communities and in the nation." *Id.* at 139, 71 S.Ct. at 632 (principal opinion) (Burton, J.); *see id.* at 140–41, 71 S.Ct. 624. *See also Kukatush Mining Corp. v. SEC*, 114 U.S.App.D.C. 27, 32, 309 F.2d 647, 652 (1962) (Bazelon, C. J., dissenting).

HEW's action in this case could have a similar crippling effect on SMHA's ability to obtain future grants.[29] While SMHA has in the past obtained grants from agencies other than HEW,[30] most of its programs are of the type supported by appropriations channeled through HEW. It is not difficult to imagine the inhospitable reception that would be given to future applications from an organization that has been accused of violating departmental regulations, misusing grant funds, and engaging in activities that create conflicts of interest.[31] The effect of HEW's action in this case, therefore, is to endanger SMHA's ability to obtain future grants, the very lifeblood of its existence. We believe this demonstrates that SMHA has been injured in fact, and coupled with its meeting of the "zone of interests" requirement, establishes that SMHA has standing to challenge the action by HEW.

**26.** *See* J.A. at 77–78.

**27.** *Id.*

**28.** *See* Tomlinson & Mashaw, *supra* note 17, at 689; Cahn & Cahn, *supra* note 15, at 953–54. *See generally* Boasberg & Hewes, *The Washington Beat: Federal Grants & Due Process*, 6 Urb.Law. 399, 402 (1974).

**29.** We recognize that SMHA has not alleged that the injury to its reputation has led to future grant denials, similar to the loss of funds and supporters alleged to have occurred in *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 131, 71 S.Ct. 624 (1951) (principal opinion) (Burton, J.). We must recall, however, that this suit was filed originally seeking immediate injunctive relief in an effort to secure continued funding before the expiration of fiscal year 1974, and well before SMHA could allege any particular results flowing from the injury incurred. All that is required is that the plaintiff allege that "he *has been or will in fact be perceptibly harmed* by the challenged agency action . . . .," *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973) (emphasis added), and we believe that SMHA has met this requirement in its amended complaint, although we do admit that the pleading could have been more carefully drafted. *See* J.A. at 77–78, 80. We believe also that the reason SMHA did not press this issue with more vigor on appeal is that, as noted above, HEW's first real challenge to SMHA's standing was an almost incidental reference to the subject in its brief. *See* note 21 *supra*, and accompanying text.

**30.** Deposition of Sister Anne Catherine, *supra* note 15, at 11–13.

**31.** *See* note 7 *supra*, and accompanying text.

As we cautioned in Part II of this opinion, however, one must be careful not to interpret this standing holding too broadly. Specifically, this opinion should not be read as supporting the contention that disappointed grant *applicants* have standing to challenge agency grant decisions. There is a distinct difference between a grantee engaged in an existing relationship with the government and an applicant initially seeking a government grant. Interrupting the existing relationship, especially for reasons as damaging as those cited by HEW in this case, places the grantee in a significantly different posture from that of the applicant, whose application denial will have little, if any, effect on its good name and reputation; by itself, the denial of a grant application would not constitute, as a matter of law, an injury to reputation. *See Gonzalez v. Freeman*, 118 U.S.App.D.C. 180, 184, 334 F.2d 570, 574 (1964).[32] Similarly, a grantee engaged in an existing relationship with the government generally would not have standing to challenge a decision to diminish or withhold future funds based solely upon the failure of Congress to appropriate full funding. *See National Consumer Information Center v. Gallegos*, 179 U.S.App.D.C. 120, 125–26, 549 F.2d 822, 827–28 & n.7 (1977).

## IV

Determining that SMHA has standing to challenge the action by HEW does not lead automatically to the conclusion that it was entitled to a hearing to protest the action.

SMHA has contended that departmental regulations, the APA, and the due process clause of the fifth amendment entitle it to a hearing.[33] Observing our duty to avoid deciding constitutional questions unless essential to the proper disposition of a case, *Harmon v. Brucker*, 355 U.S. 579, 581, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958) (per curiam), we look first to SMHA's claim that departmental regulations required HEW to provide a hearing prior to taking the action it did in this case.[34]

As mentioned above, HEW has established a grant appeals process "designed to afford to aggrieved grantees maximum due process . . . ."[35] The Departmental Grant Appeals Board has jurisdiction over several adverse determinations, most notably:[36]

> Termination, in whole or in part, of a grant for failure of the grantee to carry out its approved project proposal in accordance with the applicable law and the terms of such assistance or for failure of the grantee otherwise to comply with any law, regulation, assurance, term, or condition applicable to the grant.[37]

At first glance, this definition appears to describe precisely the action taken by HEW, and it is on this basis that SMHA claims entitlement to a hearing. More specifically, SMHA contends that in 1971 it was awarded a five-year *grant*, divided into five individual *budget* periods. Under this interpretation, the action taken by HEW in 1974, with two years remaining on the

---

**32.** Of course, in the unusual event that an application denial is accompanied by reputation-damaging remarks, a disappointed applicant might, too, be able to demonstrate an injury in fact of the type shown here by SMHA.

**33.** *See* note 15 *supra*, and accompanying text.

**34.** *See* Brief for Appellant at 36–46.

**35.** *See* note 24 *supra* ; 45 C.F.R. Part 16 (1976).

**36.** The Board also has jurisdiction over a "determination that an expenditure not allowable under the grant has been charged to the grant or that the grantee has otherwise failed to discharge its obligation to account for grant funds." 45 C.F.R. § 16.5(a)(2) (1976). The third of the six reasons for the HEW action, *see*

note 7 *supra*, and accompanying text, comes very close to being such an adverse determination. However, in the view we take of this case, we need not address this issue any further.

**37.** 45 C.F.R. § 16.5(a)(1) (1976). Subsection (b)(2) of section 16.5 requires the aggrieved grantee to have exhausted any informal appeal procedures prior to submitting the adverse determination to the Board. This subsection is inapplicable in this instance, however, because the appropriate informal appeal procedure, 42 C.F.R. §§ 50.401–.406 (1976), was not established until September 19, 1974, three weeks after this suit was commenced.

grant, must logically be viewed as a termination. SMHA supports this conclusion by reference to the definition of "termination" applicable to the grant appeals process:

> "Termination" of a grant means the termination of the grantee's authority to charge allowable costs to a grant *prior to the grant expiration date in the grant award document.*[38]

As noted in Part I above, the *only* mention of a "grant expiration date in [a] grant award document" was in the initial grant award document, and it lists the grant expiration date as *"6/30/76."*[39]

However, HEW argues that the action taken was not a "termination," but rather a "pre-award decision related to an application for the additional grant,"[40] and therefore was not subject to the jurisdiction of the Board. HEW's position is that in 1971 SMHA was approved for a five-year *project*, but that this project was composed of five individual one-year *grants* (and corresponding *budget* periods), for which SMHA had to apply each year. Thus, the HEW decision in 1974 not to re-fund SMHA did not result in the termination of a grant, since the existing grant for fiscal year 1974 was not affected and the grants for fiscal years 1975 and 1976 had not been made. HEW supports its position by referring to 42 C.F.R. § 56.107(e) (1974),[41] which states that:

> Neither the approval of any project nor any grant award shall commit or obligate the United States in any way to make any additional, supplemental, continuation, or other award with respect to any approved project or portion thereof. For continuation support, grantees must make separate application anually . . . .

■ It is settled law that great deference is to be given to an agency's interpretations of its regulations: "the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *accord, Udall v. Tallman,* 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). However, it is important to remember that the primary rationale for this doctrine is that deference is accorded to agency *expertise, Wilderness Society v. Morton,* 156 U.S.App.D.C. 121, 145, 479 F.2d 842, 866 (en banc) *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973), and an "[a]dministrative construction is less potent than it otherwise would be where it does not rest upon matters peculiarly within the administrator's field of expertise." *Thompson v. Clifford,* 132 U.S.App.D.C. 351, 364, 408 F.2d 154, 167 (1968). Also, in both *Bowles* and *Udall,* the Supreme Court was impressed by the fact that the interpretations under scrutiny had been consistently utilized by the agencies concerned for a significant period of time; indeed, in *Udall,* the Secretary's interpretation had "been a matter of public record and discussion." 380 U.S. at 17, 85 S.Ct. at 802; *see Northern Indiana Public Service Co. v. Porter County Chapter of the Izaak Walton League of America, Inc.,* 423 U.S. 12, 14, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975) (per curiam). In later cases, the Court has distinguished *Udall* in instances where the "notoriety" present in that case, *id.* at 18, 96 S.Ct. 172, was not readily apparent. *See, e. g., Zuber v. Allen,* 396 U.S. 168, 194, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). *See also United States v. National Association of Securities Dealers, Inc.,* 422 U.S. 694, 718–19, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975).

■ In this instance, neither notoriety of interpretation nor a subject peculiarly within agency expertise is present. There is no indication that HEW had ever in the past been required to interpret the word "termi-

---

**38.** 45 C.F.R. § 16.3(i) (1976) (emphasis added).

**39.** *Compare* note 3 *supra,* and accompanying text, *with* note 4 *supra,* and accompanying text (emphasis added).

**40.** *See* note 13 *supra.*

**41.** It is interesting to note that this subsection has been rescinded. *See* 42 C.F.R. § 56.107 (1976).

nation" as it applied to grants.[42] Also, "grant termination" is a term of interest to virtually all agencies, and the fact that it was here applied to a grant under HEW's "Project Period System" does not lead to the conclusion that the term is subject to HEW's special expertise.

There is a further reason for this court to accord somewhat less weight to the HEW interpretation. As we have noted twice before, the underlying reason for establishing the grant appeals process was to afford grantees *maximum* due process in disputes with HEW. It appears to us, therefore, that the Secretary was bound to interpret the term "grant termination" in the light most favorable to the grantee. In our view, he has not done so in this case, and while we have given proper deference to his arguments, we reach an opposite conclusion from that reached by both the Secretary and district court.

The most telling argument in favor of SMHA's position is that HEW, in its own regulations, has chosen the "grant expiration date *in the grant award document*" as its benchmark in defining grant termination under 45 C.F.R. Part 16. As demonstrated above, however, a grant expiration date can be found only on the initial award document, and that date, June 30, 1976, clearly comports with SMHA's position. The second and third grant award documents do not contain grant expiration dates, and since HEW has stated that these documents supersede the initial award documents *only* in that they authorize the

grantee to request an indirect cost rate,[43] then the grant expiration date in the first award document must be viewed as the controlling date.

While it is true that 42 C.F.R. § 56.107(e) (1974) lends support to HEW's interpretation,[44] we think that the weight of the evidence contained outside 45 C.F.R. Part 16 tilts in favor of the SMHA position. In the same title 45 in which the first definition of "grant termination" appears is a second definition, which the district court conceded would, if applicable, lead to the conclusion that SMHA had suffered a termination: [45]

> "Termination" means the cancellation of Federal assistance, in whole or in part, under a grant at any time prior to the date of completion.[46]

While this definition applies primarily where the grantee is a state or local government, it may also be applied to other grants.[47] In any event, this definition, standing as it does in such close proximity to the primary definition, can certainly be used as support in interpreting that former definition, and we agree with the district court's suggestion that it adds weight to SMHA's position.

Further, in the HEW Grants Administration Manual in force at the time of the key events in this case, grant period is defined as "[t]he period for which funds have been awarded; i. e., *the remainder of the project period*".[48] It is significant to note that this was the definition in force when the revised

---

**42.** HEW, in fact, resorted to some circular argumentation in informing SMHA that its action did not constitute grant termination. On June 26, 1974, the HEW regional health administrator notified SMHA that the "DHEW General Counsel [has] advised this office that our administrative decision not to renew this grant at the end of the budget period does not constitute grant termination." J.A. at 46. On August 19, 1974, the HEW General Counsel notified SMHA that he had "been advised by the cognizant regional program officials that their decision was not . . . a decision to terminate the grant, but rather was a decision not to approve a renewal grant." *Id.* at 58.

**43.** *Id.* at 103, Answer to Interrogatory 24.

**44.** *See* note 41 *supra,* and accompanying text.

**45.** J.A. at 182.

**46.** 45 C.F.R. § 74.110 (1976).

**47.** *Id.* § 74.1(b).

**48.** Grants Administration Manual, § 1–85–20 E. (1972) (emphasis added), J.A. at 154. This definition comports with that used in the 1970 Policy Statement on project grants under section 310 of the Public Health Service Act: A grant period is that "time period from the beginning date of the requested budget period through the terminal date of the project period." Record Entries 23 & 24, Exhibit 2, at 37.

grant award document appeared in June 1972. As previously noted, there was no grant period specified on that document, but there was a project period, extending until *June 30, 1976.*

Finally, the Grants Administration Manual indicates that there are two basic methods for ending support of a project: "(1) withholding support (failing to fund *noncompeting* continuation applications) and (2) withdrawing support (termination)."[49] Since HEW has conceded that SMHA and TAB were viewed as *competing* applicants for the fiscal year 1975 funds,[50] then the action taken by HEW must logically be considered as withdrawing support from, and therefore terminating, SMHA.

For the foregoing reasons, we hold that the action taken by HEW was a termination, and, therefore, that by its own regulations, HEW was obliged to provide SMHA with a hearing. We intimate no position on whether HEW, by more carefully drafted regulations,[51] could have denied SMHA a hearing, because that inquiry necessarily would lead to a constitutional determination. We hold only that, under the regulatory framework in existence at the appropriate stages of this case, SMHA was entitled to a hearing prior to termination.[52]

## V

For the foregoing reasons, we vacate the judgment of the district court and remand to that court with the instruction to remand to the Secretary so that a formal hearing can be held before the Grant Appeals Board.[53] At this hearing, SMHA should be given the opportunity to rebut, on the record, the allegations made by HEW in its letter of June 6, 1974. If the allegations cannot be effectively rebutted, they can, and should, remain part of the permanent record, fully capable of consideration in future applications by SMHA. If the allegations prove to be partially or wholly without basis, however, they should be stricken from the record, in whole or in part. In either event, SMHA will have been provided the "maximum due process" sought by the HEW regulations.

*Vacated and remanded.*

WILKEY, dissenting:

I am unable to join in the court's decision for two reasons. First, in my view, SMHA has not established its standing to bring this suit; it has failed in its responsibility clearly to allege facts demonstrating that it is a proper party to invoke the exercise of the court's remedial powers. Second, assuming for the sake of argument that appellant has established standing, I would affirm the District Court's judgment, because I agree on the merits with Judge Flannery that SMHA was not entitled to a hearing before the Grant Appeals Board either under HEW regulations or the Due Process Clause.

## I. THE PROBLEM OF STANDING

SMHA has presumably brought this action because it believes that it has sustained

---

**49.** Grants Administration Manual, § 1–85–40 D. 1. (1972) (emphasis added), Brief for Appellant, App. B, at 94.

**50.** J.A. at 38.

**51.** We note, for instance, that the Grants Administration Manual issued three months after this suit was filed is somewhat more explicit in its definition of termination. *See* Grants Administration Manual, § PHS: 1–500–20 A. 1. (1974), J.A. at 155. Even that definition, however, could be interpreted in favor of SMHA, since it uses the 45 C.F.R. § 74.110 (1976) definition of termination, *see* note 46 *supra*, and accompanying text, followed by an explanatory statement that uses the denial of a *noncompeting* application as a benchmark.

**52.** We reject any suggestion that the hearing requirement was met by the brief meeting with the regional health administrator on July 16, 1974. Not only was this meeting not on the record, it was held three weeks after TAB's application had been finally approved. If anything, this meeting should be viewed as an effort by SMHA to exhaust remedies prior to an appeal to the Grant Appeals Board.

**53.** The hearing shall be held in accordance with the procedures outlined in 45 C.F.R. §§ 16.-8(b)(2), 16.10 (1976) and, at a minimum, should be conducted before a Grant Appeals Panel. *See id.* § 16.9. As provided by HEW regulations, however, the Chairman of the Grant Appeals Board may constitute the entire Board to hear the case. *Id.* § 16.4(b).

a judicially redressable injury as a result of HEW's withdrawal of support. However, I am unable to discern from SMHA's original and amended complaints in the District Court, from its briefs in this court, or from its counsel's statements at oral argument just what redressable injury SMHA purports to have sustained. Because I agree with Judge Tamm that the subject of grantee rights is a "slumbering giant" that should be awakened cautiously, I do not think it is too much to ask that the complaining party specifically identify for this court the precise interests and rights that it is attempting to vindicate.

The real interest at stake in this case can best be identified by tracing the flow of grant money as it funnels down from the Congress through various levels of administration, to the ultimate beneficiaries—the migrant workers and their families. That real interest is a public interest, the welfare of the ultimate beneficiaries, *not* the *private* interest of SMHA attempted to be asserted here.

At the highest level of grant administration is the Department of Health, Education and Welfare, which each year receives from Congress funds specifically appropriated for the improvement of migrant worker health care. The Secretary of HEW is authorized to use these funds in making grants to public agencies or private non-profit organizations which, in turn, are to establish and operate health care facilities for migrant workers. These grants are made expressly on the condition that the grantee provide persons broadly representative of the target population an opportunity to participate in developing and implementing the funded health care programs.

At the next level of grant administration are the grantees themselves—the public agencies or private non-profit organizations. As far as I am able to tell from the record, these entities are essentially conduits for the funds. The employees of the public agencies and the board members of the non-profit organizations do not derive salaries or otherwise profit from grant money; they have no economic stake in it.

Rather, these organizations perform a managerial function with respect to the funds. They plan and implement health care services, ensuring that grant monies are properly applied in their provision. Congress' specification of public agencies and non-profit organizations was purposeful, the theory being that, because such entities have no interest in the grant money and are motivated solely by altruism, they will encourage the target populations' participation in the administration of the funds. This participation, in turn, is supposed to assure program responsiveness. Thus, the very reason organizations such as SMHA receive grant money is their supposed economic disinterest and self-abnegating spirit.

At the final level of grant administration are the health delivery systems—the clinics themselves. It is at this level that grant money is expended for capital construction, equipment, and salaries for medical personnel and other staff. These clinics are the line entities, providing health care services directly to the migrant workers and their families.

As I read the record in this case, all that has happened is that one group of non-salaried volunteer welfare workers (SMHA) has been replaced in its management role by another group of non-salaried volunteer welfare workers (TAB). It is just as if HEW shifted a grant award from one *state* agency to another *state* agency. When SMHA's grant was not renewed for a fourth year, HEW simply granted the available money to TAB, another qualified non-profit organization, which then replaced SMHA in its managerial role over the health care clinic. The grant money is now being funneled through that organization to the clinic. Thus the basic health care structure and staff established by SMHA at the outset of the grant is still intact and, although now under the management of TAB, still serves the same area. The migrants—the beneficiaries of the program—have lost nothing, the people who staff the clinics have lost nothing, and it appears to me that SMHA has lost nothing except perhaps the opportunity to help others by administering federal monies.

Nevertheless, SMHA has brought this action in the belief that it has sustained some injury in fact which this court is capable of remedying. It is evident from the complaint that SMHA is not in court to represent and assert the *personal* rights of its members.[1] It does not therefore have standing as an association in a representative capacity. Nor is SMHA here on the behalf of the migrant workers to represent *public interests* and vindicate public rights. Therefore, it does not have standing as a "private attorney general". Rather, it appears from the pleadings that SMHA has brought this action to redress its *own private claims,* to protect its *own organizational* rights. There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights the association itself may enjoy.

In order to establish such standing in its own right, however, an association must allege that it has suffered an injury in fact, economic or otherwise. The injury must be alleged with particularity; the association must plead specific and concrete facts indicating that it has sustained an injury. The existence of an injury cannot be left to the imagination of the court.[2] Moreover, the injury alleged must be distinct and palpable; it cannot be abstract, remote, or speculative.[3] Finally, the association must allege that the injury was caused by the challenged agency action and is likely to be redressed by a favorable judicial decision.[4]

Despite these requirements, SMHA has failed to allege specifically any facts, either in its original or in its amended complaints, indicating that it has sustained a redressable injury as a result of HEW action. It alleges in its complaint that it has been deprived by HEW action of two years of funding amounting to approximately $700,000 in grant money. At oral argument SMHA's counsel was specifically asked what injury the association had sustained to support its standing. Counsel responded that SMHA had lost its "property interest" in two years of grant money. However, in my view, any such "property loss" is an illusion. SMHA was a conduit. The association itself did not profit from the grant money; it was essentially a board of directors administering the grant funds for the benefit of the migrant workers. Thus, the association had no financial or economic interest in this money. The only persons who are salaried and are being paid government money are the staff personnel actually operating the health clinics. These individuals have largely retained their jobs under the new management of TAB. The clinics are still in operation. In fact, then, SMHA has not "lost" anything.

Equally important is the fact that SMHA's "loss" of funding for two years is simply not redressable. The funds putatively "lost" by SMHA were appropriated by Congress to carry out programs for specific beneficiaries during specific fiscal years—FY 1975 and FY 1976. The programs have been carried out; the funds have been spent; the true beneficiaries have already received the benefits which Congress intended that they receive. This court cannot require Congress to appropriate further funds so that appellant can have the pleasure of administering a redundant program. Nor can we require the Secretary of HEW to award to SMHA grant money appropriated by Congress in

---

1. One of the complaints by HEW against the administration of the plaintiff's group of non-salaried workers was that this board of directors was employing some of their relatives in salaried positions at the clinic which was directly contrary to HEW regulations. This is hardly the kind of an interest—in keeping relatives illegally swilling at the public trough—for which this court should grant standing to vindicate.

2. *See, e. g., Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

3. *See, e. g., O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

4. *See Warth v. Seldin,* note 2 *supra.*

future fiscal years for future programs.[5] Thus, SMHA's claimed loss of $700,000 in grant money is not only illusory but unredressable and, hence, cannot provide a basis for the Association's standing.

There is another injury mentioned in SMHA's complaint which *does* involve genuine economic loss to the Association. SMHA claims that, as a result of HEW's withdrawal of support, it was forced to breach various contractual obligations for which it remains liable. It claims damages of $100,000. Certainly these forced breaches have resulted in an injury to SMHA; and certainly this is an injury which this court can remedy. But just as certainly these forced breaches *were not caused* by HEW's non-renewal of funding. SMHA simply did not have authority to obligate grant money by contract beyond a one year period. This limitation was clearly understood by SMHA. All of the contracts breached by SMHA were contracts running beyond a one year term. To the extent that these contracts purported to obligate grant monies, they were *ultra vires,* and were entered into solely on the responsibility of SMHA. In no proper sense, then, did HEW's withdrawal of support *cause* SMHA's lingering liabilities.

What injury has SMHA sustained then as a result of HEW's action? The majority has rested its finding of standing on the theory that SMHA has suffered an injury to its good name and reputation:

> For an organization such as SMHA, dependent as it is upon grants for its very existence, a good reputation is perhaps its most valuable asset. Reputation, especially that established by past performance, is a key element in agency grant decisions, and an organization that acquires a bad reputation in the grant community based on poor performance will have a difficult burden to overcome in securing new grants. [footnote omitted]

\* \* \* \* \* \*

> The effect of HEW's action in this case, therefore, is to endanger SMHA's ability to obtain future grants, the very lifeblood of its existence. We believe this demonstrates that SMHA has been injured in fact, . . . . (Majority Opinion, —— ——— of 187 U.S.App.D.C., 524 of 574 F.2d).

This is an interesting notion; the problem is that it represents the court's own imaginative theory of how SMHA was actually injured.

*There are no specific or concrete facts alleged in SMHA's complaints, its brief, or oral argument, or elsewhere in the record which support this theory.* Although there is in the original and amended complaints a request for $1,000,000 in damages for "injury to good name and reputation", there are no specific and concrete facts regarding this asserted injury alleged in the complaints. This cryptic reference—and good round figure of One Million obviously picked out of thin air—is not sufficient to support the majority's theory regarding appellant's reputational injury.[6] The majority, then, can only be speculating as to the injury sustained by SMHA, just as was SMHA itself, although rather perfunctorily. These speculations seem in large part derived from assertions made in law review articles generally advocating grantee rights. Law reviews, though helpful at times, can not replace proper pleading.[7]

---

5. The lack of redressability here may be demonstrated by analogy to the disappointed bidder in a government contract case. If an unqualified bidder were to be improperly awarded a building construction contract, this court would not and could not, at the instance of a disappointed qualified bidder, require Congress to appropriate funds for a duplicative building; nor could this court require the award to the disappointed bidder of a future contract for some other project.

6. *See, e. g., Sierra Club v. Morton,* note 1 *supra; Warth v. Seldin,* note 1 *supra.*

7. Since SMHA was warned in advance that the whole operation was subject to annual renewals and that it had no expectancy beyond one year, then by undertaking the first year SMHA put itself in the position of incurring a hypothetical damage to reputation, if at any time during the next four years the grant was not renewed. SMHA assumed this position and

Overlooking for the moment appellant's failure to allege with particularity any remediable injury in fact, there is something else which concerns me. The words "injury to reputation" are becoming almost talismanic in our jurisprudence. A plaintiff utters these words once, and he has standing; the doors to federal courts fly open. He incants these words once more, and he has a "liberty interest"; the Due Process Clause of the Constitution descends upon him investing him with its procedural safeguards. Before we are ready to acknowledge that SMHA has sustained the injury in fact required for its standing purposes, we should consider precisely what this reputational injury amounts to in practical terms.[8]

It seems to me that if one follows the majority's reasoning that the only redressable injury sustained by SMHA has been the tarnishing of its image *within HEW* and other granting agencies, then one must conclude that this so-called "injury to reputation" really translates into the possibility that SMHA may be given fewer opportunities to administer federal grant money in the future. In other words, the gravamen of SMHA's complaint, at least the only remaining part found tangible by the majority, is that it may have lost opportunities to help other people and have the government pay for it. This interest in being altruistic at the government's expense strikes me as somewhat ephemeral, and I question wheth-

er the invasion of an interest of the kind suggested here constitutes a palpable enough injury to establish "injury in fact" under the doctrine of standing.

## II.  THE MERITS

Assuming that SMHA has standing to bring this action, the issue presented is whether HEW regulations or the due process clause required that HEW provide SMHA with a hearing before withdrawing support for FY 1974 and FY 1975. The District Court concluded, first, that HEW regulations did not require a hearing and, second, that SMHA did not possess a "property interest" in future funding protected by the procedural guarantees of the due process clause. My colleagues, however, conclude that HEW regulations did entitle SMHA to a hearing and therefore find it unnecessary to reach the constitutional question. I am in agreement with the analysis in Judge Flannery's opinion in the District Court and have only a few remarks by way of supplementation.

### A.  *Due Process Clause*

In its original and amended complaints, its brief in this court, and its oral argument, SMHA has insisted that it possesses a "property interest" in continued funding protected by the procedural guarantees of the Due Process Clause. Relying on *Board of Regents v. Roth*[9] and *Perry v. Sinder-*

---

8.  The majority is correct that at least since *Joint Anti-Fascist Comm. v. McGrath*, injury to reputation is a sufficient injury in fact to give an organization standing. However, in his concurring opinion in *McGrath*, Justice Frankfurter carefully inquired into just what tangible consequences the alleged injury to reputation would have for the organization. He concluded that the designation of the committee as a "Communist" organization carried with it a threat to the employment interests of committee members who were or desired to become federal employees. It was on this tangible injury which Justice Frankfurter based his determination that the committee had established the requisite injury in fact to give it standing.

9.  408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

concomitant risk. This might be comparable to a law student who goes to law school on a scholarship for the first and second year and the scholarship is not renewed the third year. Does he have an actionable damage to reputation? The nonrenewal might hamper him in getting a job on graduation because his scholarship was not renewed. But certainly the university has an option as to whom it awards scholarships. There is no claim or enforceable expectancy from one year to the next unless the scholarship so provides. The HEW Grants Administration Manual refuted here any such expectancy by providing that HEW was under no obligation for continued funding in "succeeding budget periods" if HEW "determines that continued funding is not in the best interests of the Government."  # 1–85–10 (1972).

*mann,*[10] the District Court concluded that SMHA had "no claim of entitlement that rises to the level of a property interest protected by due process guarantees of the Fifth Amendment." I agree with this conclusion.

The majority's opinion, however, raises another possible Fifth Amendment issue. Relying on a supposed injury to SMHA's reputation to confer standing on the Association, the majority raises the question whether this reputational injury implicates "liberty interests" sufficient to trigger due process protections. The District Court did not address this question because appellants have never even suggested, either in the District Court or before this Court, an invasion of their "liberty interests." My own view is that any reputational injury sustained by SMHA did not amount to a deprivation of "liberty" within the protection of the Fifth Amendment, and recent Supreme Court decisions squarely support this position.[11]

### B. *HEW Regulations*

The majority correctly points out that HEW regulations concerning the "termination" of grants are confusing and that it is an exceedingly close question whether these regulations did or did not require a hearing under the circumstances of this case. By applying the doctrine of *contra proferentem*, the majority construes the regulations against HEW and in favor of SMHA. I believe this is wrong for three reasons.

First, I think it appropriate for this court to defer to the Department's interpretation of its own regulations. As far as we can tell the regulations were being interpreted for the first time, and the Department's construction is a reasonable one.[12]

Second, I question whether the doctrine of *contra proferentem* should be used simply to penalize sloppy draftsmanship. The

doctrine is most appropriate in situations where the non-drafting party is relatively inexperienced and has relied on the terms in dispute. In such a case, there is the danger that the more experienced drafter may be taking unfair advantage of the other party. However, these factors did not exist in the instant case.

Third, I believe that the Department's construction of its regulations is most consistent with Congress' intent in enacting the Migrant Health Act. The Department's construction would give a grantee a hearing whenever the grantee had a tangible financial stake in the grant funds, that is, whenever a grant was terminated in mid-term. The appellant's interpretation of the regulations, accepted by the majority, would provide a grantee with a hearing under circumstances where it had no real financial stake but only an ephemeral "reputation" interest to protect, that is, whenever the Department denies a grantee's application for renewal of a grant.

It cannot be denied that Congress enacted the Migrant Health Act to benefit migratory workers and their families and not to benefit public agencies or non-profit organizations. Indeed, it was the very self-abnegating spirit of these organizations which commended them as appropriate vehicles for accomplishing Congress' purpose. Congress might be surprised to see the spectacle of these presumably altruistic organizations squabbling over the grant funds in an attempt to vindicate ephemeral interests at the possible expense of the migrant workers themselves, the true beneficiaries of the Government's largesse. There can be no question but that expanded procedural rights for grantees under this kind of grant program would have a tendency to interfere with the delivery of health services to the program's beneficiaries by delaying, disrupting or degrading the quality of

10. 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

11. *See, e. g., Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Paul v. Da-*

*vis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

12. *See Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

**534**

those services. For this reason I think it is important that we not broadly construe the Department's regulation as providing expansive procedural guarantees and, thereby, perhaps superordinate the interests of the grantees over those of the beneficiaries.

One other point on overall public policy involved here should be recognized. It is bad enough for efficient government that we must put up with entrenched bureaucracies of government employees who frequently assert that they have a constitutionally given right to perpetuate both the programs and themselves in spending government funds. It is even worse to confer upon—not government agencies and persons who presumably are subject to direction by proper executive authority—but to confer upon miscellaneous private organizations not within government control rights in perpetuity in programs and persons. This is really entrenching a bureaucracy when we entrench private bureaucracies which are by definition beyond effective government control. Hence, if we permit this private non-profit organization standing to sue here by recognizing its claimed ephemeral damage to reputation, and award it a hearing by rejecting the responsible Department's interpretation of its own regulations, we are in effect conferring upon organizations which are purely donee-trustees for the benefit of others a virtual perpetuity in government funds, with a right to challenge any cut-off of monies intended to be pure largesse for the benefit of persons other than this appellant.

First, because this rather peculiarly situated plaintiff-appellant lacks standing by the recognized constitutional requirement of injury in fact, and, second, because I would defer to the interpretation of the regulations made by both the responsible Department and the District Court, I cannot join in the majority's remand for a hearing and therefore respectfully dissent.